UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) **4:24CR466 SRC/RHH** |
| RASHID NAQVI, | ) ) ) |
| Defendant. | ) ) |

FILED
SEP - 4 2024
U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

## INDICTMENT

The Grand Jury charges that:

### INTRODUCTION

At all times material to this Indictment, unless otherwise specified below:

1. During his conspiracy and scheme, Defendant Rashid Naqvi defrauded Medicare out of $1,974,479.00 by fraudulently billing for sending numerous COVID-19 test kits to patients who had never requested them. Without the Medicare patients' knowledge or consent, Defendant Naqvi obtained their Medicare Numbers and identifiers by paying illegal kickbacks to his co-conspirators. After paying the illegal kickbacks for the patients' Medicare Numbers and identifiers, Defendant Naqvi used that information to submit thousands of fraudulent claims to Medicare for COVID-19 test kits, none of which the patients requested.

2. Defendant Naqvi owned and operated two laboratories that he used to submit fraudulent claims to Medicare: **(1)** Elite Diagnostics, Incorporated, located in the Eastern District of Missouri, and **(2)** Astro Diagnostics, Incorporated, located in the Southern District of Texas.

### Relevant Medicare Provisions

3. The United States Department of Health and Human Services, through the Centers

for Medicare and Medicaid Services ("CMS"), administers the Medicare Program, which is a federal health benefits program for the elderly and disabled. Medicare Part B reimburses health care providers for covered health services that they provide to Medicare patients in outpatient settings.

4. CMS acts through fiscal agents called Medicare Administrative Contractors or "MACs" which are statutory agents for CMS for Medicare Part B. The MACs are private entities that review claims and make payments to providers for services rendered to Medicare patients. The MACs are responsible for processing Medicare claims arising within their assigned geographic areas, including determining whether the claim is for a covered service.

5. Wisconsin Physicians Service Insurance Corporation ("WPS") is the Part B MAC for Eastern Missouri and thus processed the reimbursement claims that Elite Diagnostics submitted to Medicare via electronic, interstate wirings. Novitas is the Part B MAC for Southern Texas and thus processed the reimbursement claims that Astro Diagnostics submitted to Medicare via electronic, interstate wirings.

6. To receive Medicare reimbursement, providers must make appropriate application to the MAC and execute a written provider agreement. The provider agreement obligates the provider to know, understand, and follow all Medicare regulations and rules. After successful completion of the application process, the MAC assigns the provider a unique provider number, which is a necessary identifier for billing purposes.

7. Medicare providers—like Elite Diagnostics and Astro Diagnostics—could submit Medicare claims electronically. Those electronic claims were submitted via interstate wire communications.

8. For the COVID-19 test kits that were the subject of Defendant Naqvi's fraudulent

2

claims, CMS advised providers—including Defendant Naqvi—that they were required to keep documentation showing a patient's request for the COVID-19 test kit. CMS further advised providers that the failure to keep documentation showing that the patients requested the COVID-19 test kit could result in CMS recouping Medicare's reimbursement payments. Defendant Naqvi knew and understood these requirements during his scheme and conspiracy.

### Defendant Naqvi's Enrollment in Medicare

9. On or about December 5, 2018, Defendant Naqvi completed and signed the Medicare enrollment application for Elite Diagnostics. As part of Elite Diagnostics' Medicare enrollment, Defendant Naqvi made the following certification:

> I have read and understand the Penalties for Falsifying Information, as printed in the application. I understand that any deliberate omission, misrepresentation, or falsification of any information . . . contained in any communication supplying information to Medicare . . . [may be criminally prosecuted].
>
> I agree to abide by the Medicare laws, regulations and program instructions . . . including the Federal anti-kickback statute . . .
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

### Federal Anti-Kickback Statute

10. Compliance with the Anti-Kickback Statute Act (42 U.S.C. § 1320a-7b(b)) ("AKS") is a condition of payment for Medicare. In other words, Medicare will not pay for services that are provided in violation of the AKS.

11. The AKS makes it a criminal offense for any person to knowingly and willfully solicit, offer, pay or receive remuneration in return for or to induce any person to refer, recommend, furnish, or arrange for the furnishing of any items, goods, and services, paid in whole or in part by any federally funded health care program. Both parties to such an arrangement may be criminally

3

liable if one purpose of the arrangement is to obtain remuneration for the referral of services or to induce referrals.

12. Remuneration is broadly defined as anything of value, including money, goods, services, or the release or forgiveness of a financial obligation that the other party would normally have to pay. In passing the AKS, Congress intended to prohibit financial incentives that could affect the medical judgment of those providing patients with health care services.

## COUNT ONE
### (Conspiracy: 18 U.S.C. § 371)

13. Each of the above allegations is hereby incorporated by reference as if fully set forth herein.

14. Beginning in or about March 2023, and continuing through at least in or about September 2024, in the Eastern District of Missouri and elsewhere, the defendant,

**RASHID NAQVI,**

voluntarily and intentionally combined, conspired, confederated, and agreed with others known and unknown to the Grand Jury, to commit the following offense against the United States:

(a) Having devised and intended to devise a scheme and artifice to defraud and obtain money and property by means of materially false and fraudulent pretenses and representations and for the purpose of executing such scheme, and attempting to do so, did knowingly cause and attempt to cause to be transmitted by means of wire communication in interstate commerce, writings, signs, and signals in the form of interstate electronic communications, in violation of Title 18, United States Code, Section 1343; and

(b) to knowingly and willfully solicit, offer, pay, and receive any kickback, bribe, and rebate for referrals that are reimbursed in whole or part by a federal health care benefit

program, in violation of Title 42, United States Code, Sections 1320a-7b(b)(2)(B) and 1320a-7b(b)(1)(B).

All in violation of Title 18, United States Code, Section 371.

## Purpose of the Conspiracy

15. The primary purpose of the conspiracy was for Defendant Naqvi and his co-conspirators to unlawfully enrich themselves by defrauding Medicare and paying illegal kickbacks.

## Manner and Means of the Conspiracy

16. The conspiracy was carried out by Defendant Naqvi and his co-conspirators in the following manner:

17. To submit his fraudulent claims to Medicare, Defendant Naqvi needed the Medicare Numbers and identifiers of Medicare patients. Thus, Defendant Naqvi paid illegal kickbacks to his co-conspirators so that they would send him the required Medicare patient information. In exchange for Defendant Naqvi's kickback payments, his co-conspirators (who were associated with companies referred to herein as Z.Z., M.A., and D.M.E.) sent Defendant Naqvi the Medicare Numbers and identifiers for Medicare patients. Once Defendant Naqvi received the Medicare patient information that he paid for, he used that information to submit fraudulent claims to Medicare.

18. During his conspiracy to commit wire fraud and to violate the Anti-Kickback Statute, Defendant Naqvi made the following kickback payments to his co-conspirators, totaling $488,435.00.

5

| Date | Kickback Recipient | Payment Type | Defendant Naqvi's Listed Description | Amount |
|---|---|---|---|---|
| 4/3/2023 | D.M.E. | Check | Covid Kits (1,000) | $30,000 |
| 4/21/2023 | Z.Z. | Bank Wire | Covid kits and shipping | $70,000 |
| 4/27/2023 | M.A. | Bank Wire | 1,000 | $25,740 |
| 5/2/2023 | Z.Z. | Bank Wire | Procurement and courier services | $62,400 |
| 5/4/2023 | Z.Z. | Bank Wire | Final PMT 10K Procurement and Courier | $20,000 |
| 5/5/2023 | M.A. | Bank Wire | 10K Procurement Round 2 | $50,000 |
| 5/8/2023 | Z.Z. | Bank Wire | Payment for 10k procurement, shipping, and processing | $50,000 |
| 5/16/2023 | M.A. | Bank Wire | MGMT Consulting and BIZDEV | $69,040 |
| 5/23/2023 | Z.Z. | Bank Wire | PMT 10K PRO C, SHIP, PROCESS | $61,255 |
| 5/23/2023 | Z.Z. | Bank Wire | Payment for 10K procurement, shipping, and processing | $50,000 |

19.     The above-referenced kickback payments from Defendant Naqvi to Company Z.Z. were sent via electronic, interstate wirings from the Southern District of Texas to a Citibank bank account located in the Eastern District of Missouri. Defendant Naqvi made those interstate wirings in furtherance of his scheme and conspiracy.

20.     Also during the conspiracy, Defendant Naqvi and his co-conspirators worked to disguise their illegal kickback payments to make them appear legitimate and lawful. As detailed above, Defendant Naqvi often falsely labeled his illegal kickback wirings as payments for the

6

procurement and shipment of COVID-19 test kits instead of calling them what they actually were: payments for the Medicare Numbers and identifiers for Medicare patients.

21. Similarly, Defendant Naqvi entered into a sham contract with his co-conspirators at Company Z.Z. that disguised their illegal kickback arrangement. Much like Defendant Naqvi's false wiring labels, his contract with Company Z.Z. did not include a single reference to Defendant Naqvi's payments for Medicare patient information. Instead, the sham contract between Defendant Naqvi and Company Z.Z. falsely stated that Defendant Naqvi's payments were made only so that Company Z.Z. could procure and ship COVID-19 test kits.

22. After receiving the Medicare patient information that he purchased from his co-conspirators, Defendant Naqvi submitted and caused to be submitted fraudulent claims to Medicare for purportedly sending COVID-19 test kits to the Medicare patients whose information he purchased. For many of the patients, Defendant Naqvi submitted claims for multiple COVID-19 test kits per patient, despite the fact that the patients had never requested a single COVID-19 test kit. In all, Defendant Naqvi—through Elite Diagnostics and Astro Diagnostics—billed Medicare approximately 22,898 times for sending COVID-19 test kits to Medicare patients whose information he purchased with illegal kickbacks.

23. Despite billing Medicare for sending COVID-19 test kits to patients, Defendant Naqvi never actually sent COVID-19 test kits to any Medicare patients. Instead, Defendant Naqvi had his co-conspirators at Companies Z.Z., M.A., and D.M.E. mail COVID-19 test kits to the Medicare patients whose information Defendant Naqvi purchased. Under the fraudulent scheme employed by Defendant Naqvi, neither himself nor either of his companies had any contact or relationship with the patients who were the subject of his fraudulent claims. In fact, many of the

reimbursement claims that Defendant Naqvi submitted to Medicare were for Medicare patients who were deceased.

24. For all of the COVID-19 test kit reimbursement claims submitted by Defendant Naqvi to Medicare, Defendant Naqvi lacked the required documentation demonstrating that the Medicare patients requested those test kits. In fact, the Medicare patients who were the subject of Defendant Naqvi's fraudulent claims did not request any COVID-19 test kits. In addition, Defendant Naqvi never received consent from the Medicare patients to use their Medicare Numbers and identifiers.

25. Defendant Naqvi continued to submit fraudulent claims to Medicare even after receiving persistent calls from Medicare patients who told him that they did not request—nor did they want—any COVID-19 test kits. Despite these calls—and despite knowing that he had to have documented patient requests on file—Defendant Naqvi continued to submit the fraudulent claims so that he and his co-conspirators could enrich themselves through Medicare reimbursements and illegal kickbacks. Through his fraudulent claims to Medicare, Defendant Naqvi requested that Medicare pay him a total of $4,579,850.00. As a result of Defendant Naqvi's fraudulent claims, Medicare paid Defendant Naqvi $1,974,479.00.

**Defendant Naqvi Created False Documentation to Conceal his Fraudulent Billing**

26. After fraudulently taking nearly $2 million from Medicare, Defendant Naqvi continued his conspiracy and scheme during subsequent audits by Medicare investigators. During those audits, Defendant Naqvi made material misrepresentations and concealed material facts to avoid detection of his crimes. In doing so, Defendant Naqvi produced several false and fraudulent records to the Medicare investigators.

8

27.     First, Defendant Naqvi produced records falsely reflecting that the Medicare patients requested the COVID-19 test kits. But, in truth and fact, as Defendant Naqvi knew full well, the Medicare patients never requested the COVID-19 test kits, and the records reflecting such false requests were fraudulent.

28.     Second, Defendant Naqvi produced documents that he drafted which falsely represented that the Medicare patients authorized Medicare to pay Defendant Naqvi for providing the COVID-19 test kits. In truth and fact, as Defendant Naqvi well knew, the Medicare patients did not authorize Medicare to pay Defendant Naqvi for providing COVID-19 test kits that they never requested and knew nothing about.

29.     Not only did Defendant Naqvi produce false and fraudulent records to the Medicare investigators, but he also concealed from the Medicare investigators that his COVID-19 test kit Medicare claims were the result of illegal kickbacks. For example, when a Medicare investigator asked Defendant Naqvi to produce any contracts related to the COVID-19 test kits that he billed for, Defendant Naqvi refused to produce his contract with the company to which he was paying illegal kickbacks (Company Z.Z.).

## Overt Acts

30.     In furtherance of the conspiracy and to affect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Missouri:

31.     On or about the dates listed immediately below, Defendant Naqvi wired or caused to be wired the following payments to Company Z.Z.'s bank account in the Eastern District of Missouri.

| Date | Kickback Recipient | Payment Type | Defendant Naqvi's Listed Description | Amount |
|---|---|---|---|---|
| 4/21/2023 | Z.Z. | Bank Wire | Covid kits and shipping | $70,000 |
| 5/2/2023 | Z.Z. | Bank Wire | Procurement and courier services | $62,400 |
| 5/4/2023 | Z.Z. | Bank Wire | Final PMT 10K Procurement and Courier | $20,000 |
| 5/23/2023 | Z.Z. | Bank Wire | PMT 10K PRO C, SHIP, PROCESS | $61,255 |

## COUNTS TWO – FIVE
### (Wire Fraud: 18 U.S.C. § 1343)

32.   Each of the above allegations is hereby incorporated by reference as if fully set forth herein.

33.   Beginning by at least in or about March 2023, and continuing through at least in or about September 2024, in the Eastern District of Missouri, Defendant Naqvi, with the intent to defraud, devised and intended to devise a scheme and artifice to defraud Medicare and to obtain money and property from Medicare by means of material false and fraudulent pretenses, representations, and promises, as described further herein.

34.   On or about the dates set forth below, in the Eastern District of Missouri, and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud Medicare and obtain money and property by means of false and fraudulent pretenses, representations and promises and for the purpose of executing the same, Defendant Naqvi did knowingly transmit and cause to be transmitted by means of wire communication in and affecting interstate commerce, certain writings, signs, signals, pictures, or sounds, to wit:

| Count | Date | Wire Description |
|---|---|---|
| 2 | 4/21/2023 | A payment of $70,000 wired from Defendant Naqvi in the Southern District of Texas to Company Z.Z.'s bank account in the Eastern District of Missouri. |

10

| 3 | 5/2/2023 | A payment of $62,400 wired from Defendant Naqvi in the Southern District of Texas to Company Z.Z.'s bank account in the Eastern District of Missouri. |
| 4 | 5/4/2023 | A payment of $20,000 wired from Defendant Naqvi in the Southern District of Texas to Company Z.Z.'s bank account in the Eastern District of Missouri. |
| 5 | 5/23/2023 | A payment of $61,255 wired from Defendant Naqvi in the Southern District of Texas to Company Z.Z.'s bank account in the Eastern District of Missouri. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT SIX
### (Obstruction of a Federal Audit: 18 U.S.C. §§ 1516 & 2)

35.   Each of the above allegations is hereby incorporated by reference as if fully set forth herein.

36.   From on or about July 2, 2023, through on or about August 15, 2023, in the Eastern District of Missouri and elsewhere, the defendant, Rashid Naqvi, with the intent to deceive and defraud the United States, endeavored to influence, obstruct, and impede a federal auditor in the performance of official duties relating to Elite Diagnostics, an entity receiving in excess of $100,000, directly and indirectly, from the United States in a one-year period under a contract, by among other things, furnishing the auditor (CoventBridge) with fraudulent documents and records designed to support the Medicare billings that were subject to audit in order to conceal that patients had not requested the COVID-19 test kits for which Defendant Naqvi had submitted fraudulent billing claims.

In violation of 18 U.S.C. §§ 1516 and 2.

### FORFEITURE ALLEGATION

The Grand Jury further alleges there is probable cause that:

1.   Pursuant to Title 18, United States Code, Sections 982(a)(2), upon conviction of an offense in violation of Title 18, United States Code, Section 1343, as set forth in Counts Two

11

through Five, the defendant shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of such violation. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to such violation.

2.  If any of the property described above, as a result of any act or omission of the defendant:

   a. cannot be located upon the exercise of due diligence;
   b. has been transferred or sold to, or deposited with, a third party;
   c. has been placed beyond the jurisdiction of the court;
   d. has been substantially diminished in value; or
   e. has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL.

_____
FOREPERSON

SAYLER A. FLEMING
United States Attorney

_____
DEREK J. WISEMAN, #67257MO
Assistant United States Attorney

12